2017 SEP 25 AM 9:45

COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 74972-2-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| PHILIP G. KONG, | ) | |
| | ) | |
| Appellant. | ) | FILED: September 25, 2017 |

SCHINDLER, J. — A jury convicted Philip G. Kong of theft in the first degree and barratry. Kong seeks reversal, arguing the court erred in excluding collateral impeachment evidence of the victim. Because the record does not support Kong's argument, we affirm.

## FACTS

Pradnya Desh is the managing partner and sole owner of the law firm Desh International and Business Law (Desh International). Five attorneys, including Desh, worked at Desh International in 2013.

On August 29, 2013, Desh hired Philip G. Kong to work as an attorney at Desh International. Kong and Desh signed an employment agreement. At the time, Kong was licensed to practice law in New York and was inactive in Massachusetts. Kong was

not licensed in Washington but Desh assumed Kong would obtain his Washington license right away.

Under the employment agreement, Kong would receive 40 percent of what he billed to clients. Because it can take some time before a new employee receives a paycheck, Desh International offered to loan new employees funds at the beginning of employment.

After Kong signed the employment agreement on August 29, he told Desh he needed funds. Desh drafted a loan agreement and attached it to the employment agreement. The loan agreement states Desh International would loan Kong up to $10,000.

Through Kong, DF/Net Research Incorporated (DF/Net) retained Desh International to provide legal assistance in acquiring a Canadian software company. Desh International and DF/Net signed a client engagement agreement in early October 2013.

From January to May 2014, Kong and other Desh International attorneys worked on the acquisition for DF/Net. Kong was responsible for almost all of the communication with DF/Net. Desh International sent monthly billing statements and DF/Net always paid on time by check.

After the acquisition project was complete, Desh International sent DF/Net a final invoice dated June 5, 2014. The total amount owed was $17,725.82. The invoice instructed DF/Net to remit the check to Desh International and include the invoice number 209.

On June 17, Kong contacted DF/Net accounting manager Kevin Heins. Kong told Heins to pay the invoice in two checks: one check made out to Kong for $17,000.00 and the other check to Desh International for $725.82. Heins prepared and DF/Net's vice president, Darryl Pahl, signed the checks. Kong picked up the checks later that day. Kong deposited the check for $17,000.00 in his personal bank account.

During the June 30 Desh International staff meeting, Kong announced he was resigning from the law firm. After the staff meeting, Kong gave Desh a draft agreement stating Desh International would not sue Kong for any actions Kong took during the course of business. After Desh signed the agreement, Kong gave her an envelope. Kong told Desh the envelope contained the final payment of $725.82 from DF/Net to Desh International. Kong told Desh he " 'took some control' " and had the other check made out to him for $17,000.00. According to Desh, when she told Kong the check was supposed to be made out to the law firm, he replied, " 'Yeah, this is all — this is all really confusing. It's a misunderstanding. I'll go check with them.' " Desh called DF/Net employee Jim Choi about issuing the check to Kong and told Choi to stop payment on the check.

During the next several days, Desh and Kong communicated by text message and e-mail. Kong repeatedly told Desh not to contact DF/Net and to " 'desist from contacting' " anyone at DF/Net because her communications were causing DF/Net " 'disquiet and annoyance.' " In several messages, Kong referred to Desh's spouse and children, causing her to feel threatened.

On July 2, Desh sent an e-mail to DF/Net to request stop payment on the check to Kong. Desh sent an e-mail stating, " 'I've received some threatening emails from

[Kong] and am concerned that you may have received similar emails. I'm here to assist you in any way that I can.'" Kong e-mailed Desh shortly after she sent the July 2 e-mail to DF/Net. Kong told Desh to stop contacting DF/Net and that he considered the e-mail Desh sent to DF/Net as slander.

Later in July, Kong sent Desh a settlement agreement that provides Desh agrees to treat the $17,000 as payment for defamation. Desh refused to sign the settlement agreement and contacted the Bellevue Police Department.

In December 2014, Kong filed a lawsuit against Desh and Desh International for defamation based on the July 2 e-mail to DF/Net. The lawsuit was dismissed without prejudice on December 22, 2015 for improper service of process. Kong refiled the suit on December 24, 2015.

On April 9, 2015, the State charged Kong with theft in the first degree in violation of RCW 9A.56.030(1)(a) and .020(1). On January 15, 2016, the State amended the information to add a charge of barratry in violation of RCW 9.12.010. The State also alleged that the theft was a major economic offense under RCW 9.94A.535(3)(d), that Kong used a position of trust to commit the offense under RCW 9.94A.535(3)(n), and that Kong demonstrated and displayed an egregious lack of remorse under RCW 9.94A.535(3)(q).

Kong's theory at trial was that he and Desh had an oral agreement that the $17,000 check would be an advance on Kong's salary. Desh testified about Kong's employment at Desh International, his involvement in the DF/Net project and the final invoice, and the threatening messages he sent her. Two other attorneys at Desh International, Amrita Srivastava and Eriko Baxter, testified about working with Kong and

4

the DF/Net project. Several DF/Net employees testified, including vice president Pahl, accounting manager Heins, and president Lisa Ondrejcek.

Before the DF/Net employees testified, the State moved to exclude evidence of letters between DF/Net's new attorney and Desh alleging violations of the Rules of Professional Conduct, evidence that DF/Net considered filing a lawsuit against Desh, and evidence that DF/Net sent a letter to the Washington State Bar Association (WSBA) Practice of Law Board. The State noted Pahl appeared to conflate the letter to the WSBA Practice of Law Board with a WSBA complaint.

Defense counsel objected and argued, "[O]ne of the central tenants [sic] of the defense theory is that Ms. Desh certainly has a reason to place blame on Mr. Kong and certainly has a reason to say that . . . she was a victim in this circumstance." Kong argued the fact that DF/Net contemplated filing a lawsuit against Desh and alleged Desh violated the Rules of Professional Conduct showed motive to fabricate the allegations against Kong. The parties agreed that because the WSBA Practice of Law Board was suspended in 2014, any investigation related to the DF/Net letter was also suspended.

The court noted, "I think the only issue is [is] it relevant to Ms. Desh's motive, and the question is should Ms. Desh have been asked about it rather than this witness." The court ruled the evidence was not relevant unless Desh knew that DF/Net contemplated filing a lawsuit and sent a letter to the WSBA Practice of Law Board alleging violations of the Rules of Professional Conduct. The court concluded the evidence was impeachment on a collateral and confusing issue.

> [The evidence] would be terribly confusing for . . . the jury. The jury would be in a situation of are we going to need to be trying to resolve whether or

not this was a — a violation or not and they're not going to be given that information and so I find it would be more probative — or more prejudicial and confusing and time wasting than it would [be] probative.

During closing argument, defense counsel argued that Desh was not credible because she would face personal and professional consequences if the jury did not believe her. Defense counsel asked the jury to closely examine Desh's testimony and determine whether she was credible.

The jury found Kong guilty of theft in the first degree and barratry. By special verdict, the jury found the theft was a major economic offense and Kong demonstrated an egregious lack of remorse. Kong appeals.

## ANALYSIS

Kong seeks reversal. Kong argues the court erred in excluding the impeachment evidence of Desh. He also asserts prosecutorial misconduct during closing argument deprived him of the right to a fair trial. In a pro se statement of additional grounds, Kong makes several claims of juror misconduct and prosecutorial misconduct.

Impeachment Evidence

Kong argues the trial court erroneously excluded evidence impeaching Desh and deprived him of the constitutional right to present a defense.

We review a trial court's ruling on the admissibility of evidence for abuse of discretion. State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). A court " 'abuses its discretion by denying a criminal defendant's constitutional rights.' " State v. Iniguez, 167 Wn.2d 273, 280, 217 P.3d 768 (2009) (quoting State v. Perez, 137 Wn. App. 97, 105, 151 P.3d 249 (2007)). We review de novo an alleged denial of a

defendant's right under the Sixth Amendment to the United States Constitution to present a defense. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

Both the federal and the state constitution guarantee the right to confront and cross-examine witnesses. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; Darden, 145 Wn.2d at 620. Cross-examination of adverse witnesses serves "to test the perception, memory, and credibility of witnesses." Darden, 145 Wn.2d at 620.

However, the right to present a defense is not absolute. State v. Maupin, 128 Wn.2d 918, 924-25, 913 P.2d 808 (1996). A criminal defendant has no constitutional right to the admission of irrelevant evidence. Maupin, 128 Wn.2d at 924-25. The threshold to admit relevant evidence is low. Darden, 145 Wn.2d at 621. Even minimally relevant evidence is admissible. Darden, 145 Wn.2d at 621. Nonetheless, relevant evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403; see also Darden, 145 Wn.2d at 621.

Kong cites State v. York, 28 Wn. App. 33, 621 P.2d 784 (1980), and State v. Whyde, 30 Wn. App. 162, 632 P.2d 913 (1981), to argue the court erred in excluding impeachment evidence. In York, York was convicted of two counts of delivery of a controlled substance based largely on the testimony of an undercover investigator. York, 28 Wn. App. at 34. The trial court excluded cross-examination of the investigator about his prior employment with a sheriff's office and his termination for paperwork procedure irregularities and unsuitability for the job. York, 28 Wn. App. at 34. We held the court erred by excluding the evidence because the investigator was a critical State

7

witness and the State relied heavily on the credibility of the investigator. York, 28 Wn. App. at 35-37.

In Whyde, Whyde was convicted of second degree rape. Whyde, 30 Wn. App. at 163. The victim was a tenant in an apartment building Whyde managed. Whyde, 30 Wn. App. at 163. The court granted the State's motion to exclude evidence that the victim threatened to sue the building owner for refusing to refund her security deposit. Whyde, 30 Wn. App. at 164. We reversed and held the trial court erred by precluding Whyde from making a record to support his claim of bias of the victim. Whyde, 30 Wn. App. at 167.

Here, unlike in York or Whyde, the defense presented a great deal of impeachment evidence on the credibility and bias of Desh, and the court ruled the additional impeachment evidence that DF/Net contemplated filing a lawsuit and sent a letter to the WSBA alleging ethic violations was confusing and time wasting.

During cross-examination, the defense questioned Desh about the Rules of Professional Conduct (RPCs) that attorneys must follow. Desh admitted that failing to follow the RPCs could result in serious consequences, such as sanctions by the WSBA, including a suspension or written reprimand. Desh also acknowledged that a WSBA sanction could hurt her business, result in her losing clients, or lead to her losing her license. Defense counsel pointed Desh to the rule on the unauthorized practice of law, RPC 5.5. Desh acknowledged that if an attorney is not licensed to practice law in Washington, the attorney must be supervised and the client must be informed. Desh testified that she did not personally supervise Kong but that she told Baxter to be

responsible for supervising Kong. Desh agreed that failing to supervise Kong or inform DF/Net that Kong was not licensed would be a violation of the RPCs.

On cross-examination, the defense questioned Baxter about her working relationship with Kong and the DF/Net project. Baxter testified that she did not recall Desh instructing her to "supervise" Kong. Baxter did not know at the time that Kong was not licensed to practice law in Washington and believed she and Kong were simply "working together."

Pahl testified on cross-examination that Desh never informed DF/Net that Kong was not licensed to practice law in Washington. Desh never told Pahl that someone else needed to supervise Kong's actions. Pahl noted that Kong's title was "senior counsel" and his billing rate was $350 per hour. When Pahl later found out that Kong was not licensed in Washington, he believed DF/Net had been overcharged for Kong's services.

The trial court did not err in ruling the evidence that DF/Net later alleged Desh had violated the RPCs, contemplated filing a lawsuit against Desh, and sent a letter to the WSBA Practice of Law Board was impeachment on a collateral issue that was more "confusing and time wasting than it would [be] probative." See ER 403; State v. Oswalt, 62 Wn.2d 118, 120, 381 P.2d 617 (1963) ("It is a well recognized and firmly established rule in this jurisdiction, and elsewhere, that a witness cannot be impeached upon matters collateral to the principal issues being tried."). We conclude the trial court did not abuse its discretion in excluding the additional impeachment evidence.

Prosecutorial Misconduct

Kong also argues the prosecutor committed misconduct by vouching for Desh's credibility during closing argument. But the premise of his argument is an erroneous transcription of the report of proceedings. The State filed an unopposed motion to correct the transcription error. Kong cannot show prosecutorial misconduct.

Statement of Additional Grounds

Kong alleges numerous errors in a pro se statement of additional grounds. He asserts the court erred in failing to investigate juror misconduct when a juror fell asleep during trial and when a juror talked with a witness during trial.

Under RCW 2.36.110 and CrR 6.5, the trial court has a continuous obligation to investigate allegations of juror unfitness and to excuse jurors who are found to be unfit. State v. Elmore, 155 Wn.2d 758, 773, 123 P.3d 72 (2005). A party alleging juror misconduct has the burden to show misconduct occurred. State v. Reynoldson, 168 Wn. App. 543, 547, 277 P.3d 700 (2012); State v. Hawkins, 72 Wn.2d 565, 568, 434 P.2d 584 (1967). We review investigation of juror misconduct for abuse of discretion. Elmore, 155 Wn.2d at 768-69.

The record does not support Kong's allegations of juror misconduct. The trial court immediately took steps to address concerns about a potential sleeping juror and a juror's conversation with a witness. The allegedly sleeping juror told the court he was getting drowsy but he did not believe he fell asleep. The other juror confirmed that he asked a witness only one question as small talk and did not discuss the case. The trial court did not abuse its discretion by permitting the jurors to remain on the panel.

Kong contends the prosecutor committed misconduct during closing argument by remarking on Kong's decision not to testify, stating that Kong did not make repayments before charges were filed, emphasizing Desh's testimony, and vouching for Desh's credibility. Kong also contends the prosecutor committed misconduct by mentioning his Twitter activity during sentencing. To prevail on a claim of prosecutorial misconduct, a defendant must show the prosecutor's argument was both improper and prejudicial. State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). An abuse of discretion standard applies to allegations of prosecutorial misconduct. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). Prosecutorial misconduct is prejudicial where there is a substantial likelihood the improper conduct affected the jury's verdict. State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). In analyzing prejudice, "we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." State v. Emery, 174 Wn.2d 741, 764 n.14, 278 P.3d 653 (2012). Where, as here, a defendant does not object at trial, the defendant is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Emery, 174 Wn.2d at 760-61.

Kong claims the prosecutor mentioned Kong's decision not to testify during closing argument. He remembers this occurring during the portion of the argument labeled as "indiscernible" in the verbatim report of proceedings. We decline to consider an argument based on facts not in the record. State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008) (such claims are properly brought in a personal restraint petition).

11

Kong contends the prosecutor falsely stated Kong did not make repayments until after charges were filed. The record does not support this contention. Kong was charged with theft in the first degree on April 9, 2015. While Kong e-mailed Desh with a calculation of what he owed Desh International on March 10, 2015, he did not begin making repayments until April 22, 2015.

Kong contends that by emphasizing Desh's testimony, the prosecutor vouched for her credibility. In rebuttal, the prosecutor reminded the jury:

> You saw [Desh] testifying. The jury instructions tell you at the end of the day you are the judge of whether she's credible or not. There was nothing about her testimony even after the defense closing that suggests that she was anything other than credible.

This argument was not improper. A prosecutor does not commit improper vouching on witness credibility by arguing an inference about the evidence. State v. Warren, 165 Wn.2d 17, 30, 195 P.3d 940 (2008).

Kong contends the prosecutor committed misconduct and violated his First Amendment[1] rights at sentencing by referring to Kong's Twitter activity and e-mails to the Bellevue Police Department. We disagree. In support of the argument that Kong had not shown remorse, the prosecutor told the court that Kong had been posting about the case on Twitter and accusing Desh of lying.

Appellate Costs

Kong asks us to deny appellate costs. Appellate costs are generally awarded to the substantially prevailing party on review. RAP 14.2. Where, as here, a trial court makes a finding of indigency, that finding remains throughout review "unless the commissioner or clerk determines by a preponderance of the evidence that the

---

[1] U.S. CONST. amend. I.

offender's financial circumstances have significantly improved since the last determination of indigency." RAP 14.2. Under RAP 14.2, if the State has evidence indicating that Kong's financial circumstances have significantly improved since the trial court's finding, it may file a motion for costs with the commissioner. <u>State v. St. Clare</u>, 198 Wn. App. 371, 382, 393 P.3d 836 (2017).

    We affirm.

Leach, J.

WE CONCUR:

Spearman, J.

Cox, J.