# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70493-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| FABIAN LUKE GARZA, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 10, 2014 |
| | ) | |

SPEARMAN, C.J. — In this prosecution for child molestation, the trial court did not abuse its discretion in denying Frank Garza's motion for a new trial due to juror misconduct or in granting the jury's request for a read-back of the victim's testimony. Garza's pro se claims on appeal do not warrant relief. We affirm.

## FACTS

Based on allegations that Garza molested his niece in the spring and fall of 2009, the State charged him with two counts of child molestation in the first degree. The State's evidence at trial established that in November of 2009, Garza's wife, Jamie, operated a day-care in their Ferndale home. Jamie's sister Lindi Moore, had a daughter, five-year-old J.C., who attended Jamie's day-care. Garza was occasionally alone with the children.

One afternoon in November 2009, Jamie called Moore and told her that Garza had touched J.C. inappropriately. Moore spoke with Jamie's son, Marlo, who told Moore that Garza had inappropriately touched J.C. Later that day, Moore asked J.C. if Garza had touched her inappropriately. J.C. "pulled her

sweater up over her face and started crying and shook her head, 'yes.'" Verbatim Report of Proceeding (VRP) (02/19/13 and 02/20/13) at 179. Moore and Jamie then took J.C. and Marlo to the Ferndale Police Department.

Jamie told Ferndale Police Detective Melanie Campos that she believed she had seen "something that had happened" between J.C. and Garza. VRP (02/25/13) at 483. In a written statement, she said that a conversation with Marlo prompted her to ask J.C. and the other children if Garza had touched them. J.C., who was trying not to cry, said "'no.'" VRP at 612. Jamie asked her if Garza had told her not to tell and she said ""yeah." Id. J.C. then said Garza had touched her "on her bottom and on her front." VRP at 612.

Jamie also told police that in early November, 2009, she had discovered Garza with his hand on J.C.'s back. After Garza left the room, Jamie asked J.C. if he had touched her. She said, "'no', but had a "look on her face like she was trying to hide something." VRP at 613. J.C. eventually said Garza touched her on her bottom. When Jamie asked Garza if he touched J.C., "[h]e said maybe I rubbed her butt but I wasn't doing everything." Jamie told him to leave the house and Garza "sat down . . . and started crying." VRP at 614. Jamie recanted most of these statements at trial.

Marlo told Detective Campos that Garza had touched J.C. In a written statement, he said that five or six months earlier, he walked into the living room and saw Garza holding J.C. in his lap. J.C.'s pants were pulled down and her bare bottom was exposed. Garza was rubbing her and it looked like his hand was

up her shirt and on her leg. Garza looked up at Marlo. When Marlo looked again, J.C. was pulling her pants up.

Marlo went onto the porch and Garza followed. Marlo asked Garza why he would do such a thing, and Garza just started repeating Marlo's name. Marlo asked if he had ever done this before or to Marlo's sisters and Garza said no.

Marlo called his uncle and asked him to come get him. He waited in the bushes near the post office because he was crying and didn't want anyone to see him. When his uncle arrived, Marlo told him he had a fight with Garza and did not want to talk about it.

Garza called Marlo's cell phone, but Marlo didn't answer. Garza texted Marlo and asked him where he was and whether he needed anything. Later, Garza texted Marlo that he was going to leave for four weeks. Marlo called Garza, and Garza said that if Marlo did not want him there, he was going to Seattle to stay with a friend. Marlo said they needed his truck and his money to support them and he should just come back. Marlo made Garza promise that he wouldn't touch any of the girls. Marlo later told Jamie what he had seen between Garza and J.C. Jamie told him she had seen something involving Garza and J.C. too. They went to the police that day and told their stories.

The State charged Garza with two counts of child molestation. Count one was based on the living room incident witnessed by Marlo. Count two was based on the November 2009 incident witnessed by Jamie.

At trial, Marlo testified that most of his statement to police was untrue, including the substance of the statements he made to Jamie. He denied ever seeing Garza act inappropriately with J.C. He explained he was recanting because he did not want Garza to be convicted of something he did not do. He did not recant his statement that Jamie told him she witnessed something involving Garza and J.C.

J.C. testified that Garza touched her in her privates on several occasions. The first incident happened in her aunt's bedroom while she was watching television with her cousins. The last incident occurred when she and Garza were in the living room, Marlo was in his room, and the other kids were with Jamie. She described incidents occurring at other times and places. She said Garza touched her on her bottom, on her "private spot" in front, below her waist, and between her legs and rear end. VRP at 218-19; 222-23. She demonstrated in court where Garza touched her by pointing to her crotch, in between her legs, and her buttocks.

Garza testified and denied J.C.'s allegations. He also denied the allegations in Marlo and Jamie's recanted statements to police.

Throughout the trial, the jury complained of difficulty hearing the attorneys and witnesses. During deliberations, the jury sent out a request: "[d]ue to hearing issues early in witness questioning we are requesting the courtroom transcripts of [J.C.'s] sworn testimony." Clerk's Papers (CP) at 30. After discussing the matter

with counsel, the court responded to the jury, stating "more clarity is required as to the reason for your request." Id. The jury's response stated:

> Due to issues with acoustics within the court room and the lack of use of the microphone questions and responses by the attorneys and witness were not heard by the jurors. Thus we would like the courtroom transcripts of [J.C.] sworn testimony read. Both attorney and witness response.

CP at 31. After additional discussions, the court and counsel agreed to read back the entirety of J.C.'s testimony to the jury.

A juror also disclosed during deliberations that his daughter had been sexually assaulted the night before. After questioning the juror, defense counsel concluded, and the court and prosecutor agreed, that the juror should remain on the panel. The jury subsequently convicted Garza on count one – the incident witnessed by Marlo -- and acquitted him on count two.

Garza moved for a new trial based on allegations in the affidavit of juror Don Parker. In pertinent part, the affidavit stated:

> During the course of the trial there were many times when the jurors could not hear the witnesses and sometimes the questions posed by the attorneys. . . .
> During deliberations, jurors were unclear about what had been said by J.C., the alleged victim. I was certain that I heard that she had been touched by the defendant on the same day that she spoke to the police. I felt that the evidence had established that it could not have happened that way because the defendant was not home on the day she went to the police . . . . . Other jurors argued that she had not testified that she had been touched the day she went to the police and we could not come to an agreement on that point. It was not that she was not heard; it was that we could not agree on what she had said.
> We had found the defendant 'not guilty' on count II and were in disagreement as to count I. I requested on the morning of February 28, 2013 the second day of deliberations to hear

> J.C.'s testimony again. We sent a communication to the judge. We responded to the judge's request for clarification and soon thereafter heard J.C.'s testimony read in court. I felt I was right about what I had heard after the re-reading, but we still could not come to an agreement.
>
> Meanwhile, several jurors, including a juror who disclosed that during the trial his daughter had been sexually assaulted, were in a big hurry to wrap the case up. It was late in the day when the testimony was re-read and the jurors did not want to come back for another day of deliberations. I felt pressured to change my vote of "not guilty" on Count I and remarks were made that it didn't matter if it couldn't have happened the way J.C. said, because she said there were lots of incidents. I reluctantly changed my vote to "guilty" and I regret my decision now.

CP at 37-38. Defense counsel argued that the affidavit established two instances of juror misconduct: misleading the court about the jury's reasons for requesting a read-back, and improperly discussing the fact that one juror's daughter had been sexually assaulted.

The prosecutor responded that Garza had not shown misconduct or prejudice. Regarding the allegation that the jury misled the court in its request for a read-back, the prosecutor pointed out that the jury's reason was consistent with the jurors' hearing difficulties throughout the trial. He also noted that Garza was not prejudiced since the jury acquitted him on one count shortly after the read-back. With respect to the juror's disclosure about his daughter, the prosecutor noted that the affidavit did not indicate "when that disclosure was made, and we can't know that it was used in any fashion that would have been misconduct, and, really, the deliberations . . . , these [inhered] in the verdict as well." VRP at 671. In denying the motion, the court stated:

THE COURT: All right. Well, I did review, carefully, the written statement and I think the second basis is more significant than the first in terms of analysis. I don't find much basis in the first at all. In terms of the second, I agree with the State's analysis there. I am not going to read more into the declaration than that which is contained in it and it's susceptible to numerous interpretations, but I don't see anything that suggests that there was—that there has been stated legitimate grounds for a new trial. So, that motion will be denied.

Garza appeals.

## DECISION

Garza first contends the trial court abused its discretion in denying his motion for a new trial. We disagree.

A court may grant a new trial based on juror misconduct only if it affirmatively appears that a substantial right of the defendant was materially affected. CrR 7.5(a)(2). "A strong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury." State v. Balisok, 123 Wn.2d 114, 117-18, 866 P.2d 631 (1994) (quoting Richards v. Overlake Hosp. Med. Ctr., 59 Wn. App. 266, 271-72, 796 P.2d 737 (1998)). A court should grant a motion for a mistrial "only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly." State v. Lewis, 130 Wn.2d 700, 707, 927 P.2d 235 (1996) (citing State v. Johnson, 124 Wn.2d 57, 76, 873 P.3d 514 (1994)). We give great deference to the trial court because it is in the best position to discern prejudice for mistrial purposes. Lewis, 130 Wn.2d at 707; Smith, 124 Wn. App. at 428. We will disturb a court's decision

on a mistrial motion only if the court abused its discretion. State v. Applegate, 147 Wn.App. 166, 175-76, 194 P.3d 1000 (2008).

Garza claims there were two instances of juror misconduct warranting a new trial. First, he maintains the entire jury committed misconduct by "lying about the reason for the read-back request." Brief of Appellant at 12. This claim fails because the allegations in the affidavit inhere in the verdict and, in any event, do not make a strong, affirmative showing of misconduct.

Juror Parker's affidavit begins with the statement that, throughout the trial, jurors had trouble hearing the witnesses. The affidavit then states that jurors disagreed as to whether J.C. said she was touched on a certain day. Juror Parker states that "[i]t was not that she was not heard; it was that we could not agree on what she had said." CP at 37-38. These matters inhere in the verdict and do not support a new trial. Henslin v. Pratt, 119 Wash. 443, 444-48, 205 P. 867 (1922) (holding that jurors' disagreement about what witness said inhered in the verdict, and stating that "[i]t is common for jurors to disagree as to what the evidence shows in certain particulars. If affidavits such as are in this case will support a motion for a new trial, then it seems manifest that relatively few verdicts would stand."). Id. at 448.

Even if the jurors' recollections of the evidence did not inhere in the verdict, juror Parker's affidavit did not provide the strong, affirmative showing necessary for a new trial. Juror Parker's conclusion that the jurors' disagreement was not due to problems with hearing the testimony is speculative. It was undisputed that

jurors had problems hearing throughout the trial. Thus, it was entirely possible that the jurors who claimed J.C. never said something had simply not heard her say it. The court was therefore entitled to discount Parker's speculative claim that "[i]t was not that she was not heard...." CP at 37-38. In addition, the affidavit says nothing about the jurors agreeing, either tacitly or expressly, to mislead the court in their request for a read-back. Nor is it clear from the affidavit that the written answer to the court's question was even discussed by the jury. The affidavit thus failed to make the requisite strong, affirmative showing of misconduct.

Garza contends a second instance of juror misconduct occurred when a juror introduced extrinsic evidence of his daughter's sexual assault into the jury's deliberations. Again, he fails to demonstrate misconduct warranting a new trial.

It is misconduct for a jury to consider extrinsic evidence. Breckenridge v. Valley General Hosp., 150 Wn.2d 197, 199 n.3, 75 P.3d 944 (2003). Extrinsic evidence is information that is outside the evidence admitted at trial and is improper because it "is not subject to objection, cross-examination, explanation, or rebuttal." Id. (Citing Balisok, 123 Wn.2d at 118). But it is not misconduct for jurors to use common sense or consider their own life experiences in reaching a verdict. Johnson v. Carbon, 63 Wn. App. 294, 302, 818 P.2d 603 (1991). In determining whether a juror's comments constitute extrinsic evidence rather than personal life experience, we consider whether the comments impart the kind of

specialized knowledge that is provided by expert witnesses at trial. State v. Carlson, 61 Wn. App. 865, 878, 812 P.2d 536 (1991).

Here, the disclosed information was more in the nature of a juror's personal experience than specialized knowledge. Juror Parker's affidavit alleged only that the sexual assault was revealed; it did not allege that the matter was discussed or that any conclusions were drawn from it. Moreover, the affidavit did not indicate whether the information was revealed before or after the jury reached its verdict. In these circumstances, the court did not abuse its discretion in denying Garza's motion for a new trial.[1]

Garza next contends the court abused its discretion in allowing only J.C.'s testimony to be read back to the jury. He claims "[t]his procedure unduly and unfairly emphasized the alleged victim's testimony, and denied the defendant . . . a fair trial." Brief of Appellant at 19. There was no abuse of discretion.[2]

A trial court has discretion to permit a jury to review witness testimony during its deliberations. State v. Monroe, 107 Wn.App. 637, 638, 27 P.3d 1249 (2001); State v. Koontz, 145 Wn.2d 650, 658, 41 P.3d 475 (2002). Such review is disfavored, however, and "must be weighed against the danger that the jury 'may

---

[1] Garza states in his brief that the juror not only revealed the sexual assault, but also "urg[ed] the jury to convict on that basis." Brief of Appellant at 14. Nothing in Juror Parker's affidavit supports that assertion.

[2] The State contends this argument is raised for the first time on appeal and does not qualify for review under RAP 2.5(a) because it does not involve manifest constitutional error. Garza's counsel contends the issue should be reviewed because trial counsel was misled by the jury and because the alleged error concerns his constitutional right to a fair and impartial jury. We need not resolve this issue because even assuming the issue is properly before us, the court did not abuse its discretion.

place undue emphasis on testimony considered a second time at such a late stage of the trial.'" Koontz, 145 Wn.2d at 654 (quoting United States v. Montgomery, 150 F.3d 983, 999 (9th Cir.1998); State v. Morgensen, 148 Wn.App. 81, 87, 197 P.3d 715, 717-718 (2008). "It is seldom proper to replay the entire testimony of a witness," and courts should take precautions against unduly emphasizing testimony. Koontz, 145 Wn.2d at 657.

Here, the trial court exercised appropriate caution before allowing the read-back of J.C.'s testimony. Counsel and the court discussed the issue at great length, weighing the jurors' difficulty hearing against the dangers of emphasizing particular testimony. Before acting, they sought clarification of the jury's reasons for requesting a read-back. When the jury responded, defense counsel told the court that, given the jurors' problems hearing J.C.'s testimony, a transcript of that testimony should be read to the jury in its entirety. Counsel believed that the only other alternative was a mistrial. The prosecutor agreed, noting that reading back the entirety of J.C.'s testimony would avoid emphasizing any one portion of it. The parties and the court proceeded to discuss and implement precautions for ensuring that the read-back was as benign as possible. These included not allowing the jury to have a transcript of the testimony and having J.C.'s testimony read by a neutral party, in open court, and only once.

Considering the jury's reasons for requesting a read-back, the court's thorough vetting of the issue with counsel, the agreement of all parties to the

read-back, and the precautions taken by the court to minimize any prejudicial effects, we conclude the court did not abuse its discretion.[3]

Garza raises several additional claims in his pro se statement of additional grounds for review. He contends the State's "repeated use of Marlo's recanted statement" was "prejudicial" and denied him a fair trial. Appellant's Statement of Additional Grounds (SAG) at 2. But evidence that is prejudicial may nevertheless be admissible. ER 401, 403. Garza does not claim that the evidence was inadmissible. Nor does he articulate a specific basis in law for concluding that the State's use of the evidence was error. An "appellate court will not consider . . . additional grounds for review if [appellant] does not inform the court of the nature and occurrence of [the] alleged errors"). RAP 10.10(c). The claim therefore fails.

Garza also contends the trial court violated the spousal privilege contained in RCW 5.60.060 when it allowed his wife to testify against him. He concedes the statute allowed his wife to testify if his crime was against a child for whom he was a parent or guardian. He argues in conclusory fashion that he was not his niece's parent or guardian and that the trial court was wrong in concluding otherwise. But he nowhere addresses the arguments, evidence, and ruling on this issue below. His contention is therefore too conclusory to merit consideration. RAP 10.10.

---

[3] For the first time on appeal, Garza objects to the read-back procedure used by the court, arguing that the court should have read back the testimony of all the witnesses. In addition to not being preserved, this argument ignores the length of the trial. The parties presented numerous witnesses over four days. While reading back the entire trial might be appropriate when a trial is extremely short, that was not the case here. See State v. Morgensen, 148 Wn. App. at 89-90.

- 12 -

Next, Garza contends his conviction for the alleged incident in Jamie's bedroom is not supported by sufficient evidence ". . . because the victim's version of the offense was physically impossible." SAG at 4. Garza was acquitted on this count.

Garza also argues that his conviction is not supported by sufficient evidence because ". . . [t]he State did not establish when and where the alleged assault occurred." SAG at 5. But Garza again relies on evidence relating to the count on which he was acquitted. He then mentions testimony from defense witnesses to the effect that J.C. had denied being touched inappropriately by anyone. There was contrary evidence, however, and the weight, credibility, and persuasiveness of the evidence are matters for the trier of fact. State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992) (abrogated on other grounds by In re Pers. Restraint of Cross, 180 Wn.2d 664, 681, n.8, 327 P.3d 660 (2014)).

Finally, Garza contends "The trial court erred by not allowing my lawyer to show that some witness[es] were biased because of their own sexual abuse." SAG at 5. He argues that "[t]heir own histories with childhood sex abuse made them more prone to believe J.C.'s statements, even though they were physically impossible." SAG at 6. There was no abuse of discretion.

A trial court has discretion to determine the scope of cross examination. State v. McDaniel, 83 Wn. App. 179, 184, 920 P.2d 1218 (1996). The court may reject cross examination where the circumstances only remotely tend to show bias. State v. Buss, 76 Wn. App. 780, 788, 887 P.2d 920 (1995) (abrogated on

No. 70493-1-I/14

other grounds by State v. Martin, 137 Wn.2d 774, 975 P.2d 1020 (1999)). Where a case hinges on the credibility of essentially one witness, that witness' believability or motive must be subject to close scrutiny. State v. Roberts, 25 Wn. App. 830, 834, 611 P.2d 1297 (1980). In this case, defense counsel argued that prior sexual abuse of J.C.'s mother and aunt was relevant to their motivation and bias. The court ruled that any abuse of the mother was "a collateral matter related to an event that may or may not have happened that doesn't relate at all to Mr. Garza [.]" VRP at 189. Garza offers no principled basis for concluding that the court abused its discretion. Nor is an abuse of discretion manifestly apparent. The State's case did not depend solely on the mother's testimony and the mother's prior sexual abuse was a collateral matter of marginal relevance.

With respect to J.C.'s aunt, the defense asked her, without objection, about her prior sexual abuse and whether she was "more likely to jump to some conclusions with respect to this case?" VRP at 395. Thus, contrary to Garza's assertions, he was not precluded from asking her about her own sexual abuse and potential bias.

Affirmed.

Spearman, C.J.

WE CONCUR:

- 14 -